

**EXHIBIT A**

**STATE OF INDIANA**
**MARION COUNTY SUPERIOR COURT**

LISA LATZ CONDES and JIMMY JOHN ）   CASE NO. 49C01 **11 02** PL **0 0 5 1 9 2**
Individually and as Next Best Friends of ）
YEAHSEN LATZ JOHN, a Minor ）
）
   Plaintiffs ）
）
  v. ）     **FILED**
）
MED-EL CORPORATION, MED-EL ）  (202) FEB **0 9** 2011
ELEKTROMEDIZINISCHE GERÄTE ）
）  *Elizabeth R. White*
   Defendants. ）  CLERK OF THE MARION CIRCUIT COURT

## COMPLAINT

Plaintiffs Lisa Latz Condes and Jimmy John individually and as Next Best Friends of

Yeahsen Latz John, a minor, state as follows:

### I. PARTIES

1. Plaintiff Lisa Latz Condes is an individual residing in the State of Indiana with

her minor son, Plaintiff Yeahsen Latz John.

2. Plaintiff Jimmy John is an individual residing in the State of Arizona.  Mr. John

is the father of Yeahsen.

3. Upon information and belief, Med-El Corporation ("Med-El Corp.") is a North

Carolina company that designed, manufactured, and/or sold the cochlear implant that was

implanted into Yeahsen at a hospital in Indiana.

4.     Upon information and belief, Med-El Elektromedizinische Geräte ("Med-El Austria") is an Austria company that designed, manufactured, and/or sold the cochlear implant and went through an approval process in the United States to sell the implant here.[1]

## II.     JURISDICTION AND VENUE

5.     This Court has jurisdiction over Defendants under Trial Rules 4.4(A)(1), (3), and (4) because Med-El does business in the State of Indiana and sold the defective cochlear implant to be implanted into a patient in the State of Indiana.

## III.     YEAHSEN'S FAILED IMPLANT

6.     Yeahsen Latz John was born on August 28, 2002.  Yeahsen is the son of Lisa Latz Condes and Jimmy John.  Yeahsen was diagnosed as profoundly deaf when he was approximately three months old.

7.     At 12 months old, Yeahsen was approved for cochlear implants.  Cochlear implants are electronic hearing devices that deliver electrical pulses that stimulate nerve fibers in the cochlea.  The auditory nerve transmits the signals to the brain, and the brain interprets the signals as sound.

8.     On December 11, 2003, Yeahsen was implanted into his left ear with an "Implant C40+," which is the implanted portion of the Med-El COMBI 40+ Cochlear Implant System ("COMBI 40+").[2]  The COMBI 40+ was designed, manufactured, and/or sold by Med-El.

---

[1] For purposes of this Complaint, Plaintiffs will use "Med-El" to refer to both Med-El Corp. and Med-El Austria.
[2] Yeahsen's right ear was implanted with an Advanced Bionics HiRes 90K implant.  Yeahsen has never had problems with his right implant, and Advanced Bionics is not part of this lawsuit.

9.     No changes or alterations were made to the COMBI 40+ implanted into Yeahsen from the time it left Med-El until the time it was implanted.

10.     Sometime beginning in 2006, Yeahsen was experiencing a shocking sensation from the COMBI 40+.  Yeahsen's learning progress began to slow, and he became less social. Yeahsen would cry and flinch when a caregiver would attempt to turn the implant on. Yeahsen screamed in pain and was hard to console after he appeared to be shocked when his Med-El coil came in contact with his internal magnet.  Yeahsen would instinctively pull the coil off his head.  If Yeahsen's hands were restrained so that he could not pull the coil off, his facial muscles could be seen twitching.

11.     Sometime in 2007, a representative from Med-El examined Yeahsen and improperly concluded that nothing was wrong with the implant.  This representative was provided information regarding Yeahsen's symptoms, including marked fluctuations in power, an unwillingness to wear the external headpiece, an appearance of being shocked, becoming scared when a caregiver would turn the device on, and a lack of expected progress in speech and language milestones.  The representative did a telemetry test on the implant and incorrectly determined that it was in good working order.  The representative alleged that there was either a "soft failure" or Yeahsen's problems were behavioral in nature.

12.     On June 8, 2010, the insurance company providing coverage to Yeahsen approved a replacement cochlear implant.  Yeahsen had this surgery on July 15, 2010.  Dr. Fritch performed the surgery and removed the Med-El device.  Dr. Fritch found that the ceramic casing of the Med-El device was shattered.  Dr. Fritch opined that cerebral spinal fluid was getting through the ceramic casing, causing the electrodes of Yeahsen's implant to

- 3 -

misfire randomly. The result of the misfiring electrodes caused the pain, loudness, and twitching Yeahsen suffered. Dr. Fritch shipped the shattered device directly to Med-El.

13.     Yeahsen's COMBI 40+ was defective, causing him to experience excruciating pain and mental anguish.

## IV.     FEDERAL REGULATIONS

14.     The U.S. Food and Drug Administration ("FDA") regulates cochlear implants pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA").

15.     According to the FDA's website, a cochlear implant device looks like this:



16.     The Medical Device Amendments ("MDA") of the FDCA establish that cochlear implants are Class III devices, which are the most highly-regulated devices. A Class III device is one that supports or sustains human life or is of substantial importance in preventing impairment of human health or presents a potential, unreasonable risk of illness or injury. The MDA established a pre-market approval ("PMA") application process for Class III devices. A Class III device sold without the FDA approvals or without following strict FDA guidelines is considered "adulterated."

- 4 -

17.     Any modification affecting the safety or effectiveness of an approved device, including any change of the manufacturing facility, requires supplemental premarket approval. This includes, but is not limited to, changes in performance, design specifications, components, and operations.

18.     The FDA requires Class III device manufacturers to comply with Current Good Manufacturing Practices ("CGMP").  Class III devices not satisfying CGMP requirements are also considered adulterated.

19.     The FDA prohibits adulterated devices from entering the stream of commerce.

## V.     THE COMBI 40+

20.     Med-El was responsible for the design, manufacture, assembly, packaging, warnings, quality, and sale of the COMBI 40+.

21.     The FDA issued its approval order for Med-El's PMA for the COMBI 40+ on August 20, 2001.

22.     The COMBI 40+ that Yeahsen had implanted into his left ear is a cochlear implant system consisting of the Implant C40+, the TEMPO+ Patient Kit, the DIB (Diagnostic Interface Box) System, the Detector Box, and the Surgical Kit.

23.     The implanted portion, the Implant C40+, is implanted under the skin behind the ear.  The Implant C40+ consists of a ceramic housing, an active electrode array that is inserted into the cochlea during surgery, and a reference electrode, which is placed under the temporalis muscle.

- 5 -

24.     The TEMPO+ Patient Kit is a modular system that can be worn entirely at ear level, though Yeahsen wore it on his shoulder. Yeahsen had plastic surgery to build his ears so that he could someday wear the device behind his ear.

25.     According to Med-El's COMBI 40+ package insert, the TEMP+ allows an external microphone to pick up sounds from the environment and sends the sounds to a speech processor. The speech processor analyzes the sound signal from the microphone according to the selected speech coding strategy and transforms it into a coded electrical signal that is sent to the externally worn coil. This coded signal contains information about how to stimulate the individual electrodes so changes in pitch and loudness can be perceived. The magnetically secured coil sends the coded signal across the skin to the implant package via an inductive link. The energy necessary for stimulation is also sent via the inductive link. The implant decodes the signal and sends a corresponding pattern of rapid stimulation pulses to the individual electrodes on the electrode array. These stimulation pulses travel along the auditory nerve to the brain, where the brain can categorize the sound and assign meaning.

A true and accurate copy of the Med-El Combi 40+ package insert is attached as Exhibit A.

## VI.    MED-EL'S FAILURES

26.     Med-El designed, manufactured, and/or sold the COMBI 40+ in a manner that violated the conditions of the PMA.

27.     Based on a June 7 through June 16, 2004 inspection, the FDA issued a warning letter dated November 16, 2004 to Defendant Med-El Austria. With regard to cochlear implants, including the COMBI 40+, the FDA found that Med-El was in violation of the

- 6 -

FDA's CGMP requirements of the Quality System Regulations ("QSRs") pursuant to Title 21 of the Code of Federal Regulations ("CFR"). The following are "significant violations" the FDA identified:

a.   Failure to establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met, as required by 21 CFR 820.30(a)(1). . . .

b.   Failure to establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation, as required by 21 CFR 830.30(i). . . .

c.   Failure to maintain procedures to ensure that the design requirements relating to a device are appropriate and address the intended use of the device including the needs of the user and patient. The procedure shall include a mechanism for addressing incomplete, ambiguous, or conflicting requirements. The design input requirements shall be documented and shall be reviewed and approved by a designated individual(s), as required by 21 CFR 820.30(c). . . .

d.   Failure to establish and maintain procedures for validating the device design, as required by 21 CFR 820.30(g). . . .

e.   Failure to establish and maintain a [Design History File] for each type of device. The DHF shall contain or reference the records necessary to demonstrate that the design was developed in accordance with the approved design plan and the requirements, as required by 21 CFR 820.30(j). . . .

f.   Failure to establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements. Design output procedures shall contain or make reference to acceptance criteria and shall ensure that those design outputs that are essential for the proper functioning of the device are identified, as required by 21 CFR 820.30(d). . . .

g.   Failure to establish and maintain procedures to ensure that the device design is correctly translated into production specifications, as required by 21 CFR 820.30(h). . . .

h.   Failure to establish and maintain data that clearly describe or reference the specified requirements, including quality requirements, for purchased

or otherwise received product and services, as required by CFR 820.50(b). . . .

i.   Failure to establish and maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements. Each manufacturer shall establish and maintain the requirements, including quality requirements, that must be met by suppliers, contractors, and consultants. Each manufacturer shall evaluate and select potential suppliers, contractors, and consultants on the basis of their ability to meet specified requirements, including quality requirements. The evaluation shall be documented, as required by 21 CFR 820.5(a)(1). . . .

j.   Failure to adequately maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements by CFR 820.50. . . .

k.   Failure to define the type and extent of control to be exercised over the product, services, suppliers, contractors, and consultants, based on the evaluation results as required by 21 CFR 820.50(a)(2). . . .

l.   Failure to establish and maintain procedures for acceptance for incoming product. Incoming product shall be inspected, tested, or otherwise verified as conforming to specified requirements. Acceptance or rejection shall be documented, as required by 21 CFR 820.80(b). . . .

m.   Failure to establish and maintain procedures for analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems, as required by 21 CFR 820.100(a)(1). . . .

n.   Failure to establish and maintain procedures for investigating the cause of nonconformities relating to product processes, and the quality system, as required by 21 CFR 820.100(a)(2). . . .

o.   Failure to adequately maintain procedures for implementing corrective and preventive action, and failure to document all activities and results under this section, as required by 21 CFR 820.100(b). . . .

p.   Failure to establish and maintain procedures to control product that does not conform to specified requirements. The procedures shall address the identification, documentation, evaluation, segregation, and disposition of

nonconforming product.   The evaluation of nonconformance shall include a determination of the need for an investigation and notification of the persons or organizations responsible for the nonconformance.  The evaluation and any investigation shall be documented, as required by 21 CFR 820.90(a). . . .

q.     Failure to establish and maintain procedures that define the responsibility for review and the authority for the disposition of nonconforming product.   The procedures shall set forth the review and disposition process.   Disposition of nonconforming product shall be documented. Documentation shall include the justifications for use of nonconforming product and the signature of the individual(s) authorizing the use, as required by 21 CFR 820.90(b)(1). . . .

r.     Failure to maintain device master records (DMR's) and to ensure that each DMR is prepared and approved in accordance with 21 CFR 820.40. . . .

s.     Failure to establish and maintain procedures for identifying valid statistical techniques required for establishing, controlling, and verifying the acceptability of process capability and product characteristics where appropriate, as required by 21 CFR 820.250(a). . . .

t.     Failure to provide procedures addressing the data entry requirements for transferring information from complaint files to the electronic complaint database.  The database is used for data analysis.  When all essential information from complaints and failure analysis fails to provide the results of a process, which cannot be fully verified by subsequent inspection and test, and process shall be validated with a high degree of assurance and approved according to established procedures as required by 21 CFR 820.75. . . .

u.     Failure to adequately establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system as required by 21 CFR 820.22. . . .

A true and accurate copy of the FDA's November 16, 2004 warning letter is attached as Exhibit B.

28.   This inspection also revealed that the Med-El devices are "misbranded within the meaning of section 502(t)(2) of the Act . . . ."  Additional "significant deviations" include, but are not limited to:

- 9 -

a.  Failure to provide documentation and recordkeeping information that facilitates timely follow-up and inspection by FDA, as required by 21 CFR 803.17(b)(1). . . .

b.  Failure to provide all DMR information to FDA, as required by 21 CFR 803.50. . . .

Ex. B at 4.

29.   The FDA notified Med-El that "the inspections revealed that your devices appear to be adulterated within the meaning of section 501(h) of the Act (21 U.S.C. 351(h)), in that the methods used in, or the facilitates or controls used for, their manufacture, packing, storage, or installation are not in conformity with the [CGMP] requirements of the [QRS] found at Title 21, [CFR], Part 820." The FDA stated that "The specific violations noted in this letter . . . may be symptomatic of serious underlying problems in your firm's manufacturing and quality assurance systems." The FDA stated that this letter may not be exhaustive of Med-El's failures. Ex. B at 1.

30.   The FDA also threatened to stop allowing the COMBI 40+ to be imported into the United States, stating, "Given the serious nature of these violations of the Act, cochlear implants . . . manufactured by your firm, imported or offered for import are subject to refusal of admission under section 801(a) of the Act, 21 U.S.C. 381(a), in that they appear to be adulterated. As a result, FDA may take steps to refuse these products, known as "detained without physical examination," until these violations are corrected." Ex. B at 4.

31.   In addition, the FDA inspected the Med-El plant on March 29 through April 1, 2004 and issued violations of the QRS. Two of those violations were included in the November 16, 2004 warning letter:

- 10 -

a.  Failure to provide procedures addressing the data entry requirements for transferring information from complaint files to the electronic complaint database. The database is used for data analysis. When all essential information from complaints and failure analysis fails to provide the results of a process, which cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures, as required by 21 CFR 820.75.

b.  Failure to adequately establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system as required by 21 CFR 820.22.

Ex. B at 4–5.

32.    The FDA urged Med-El to take prompt action to correct the violations and bring its products into compliance with the federal laws. Ex. B at 4.

33.    The COMBI 40+ was manufactured in violation of PMA specifications and other federal regulations.

34.    The COMBI 40+ was manufactured in violation of CGMP requirements.

35.    The COMBI 40+ was manufactured in violation of the FDA's QSRs.

36.    Upon information and belief, Med-El did not seek supplemental FDA approval for each modification of the COMBI 40+ or its manufacturing processes.

37.    Yeahsen's COMBI 40+ and/or its component parts were defective and adulterated.

38.    Med-El knew or should have known that the COMBI 40+ was defective, including that the ceramic casing shattered causing injury to its wearers.

39.    Med-El knew or should have known that other cochlear implants manufactured by other manufacturers were producing similar symptoms in patients. Another manufacturer,

- 11 -

Advanced Bionics, recently voluntarily recalled a cochlear implant, the HiRes 90K.  The complaints alleged, among other things, included shocking sensations, just like Yeahsen experienced.

40.   Upon information and belief, Med-El stopped manufacturing the COMBI 40+ with a ceramic casing because the ceramic casing shattered.  Med-El did not communicate this failure to Plaintiffs, even after Med-El's representative examined Yeahsen.

## VII.   CAUSES OF ACTION

### *COUNT 1 – Negligence*

41.   Plaintiffs incorporate all of the above paragraphs.

42.   Med-El owed a duty to Plaintiffs to manufacture the COMBI 40+ with due care and in compliance with applicable regulations and FDA-approved specifications.

43.   Med-El owed a duty to Plaintiffs to avoid foreseeable dangers with the COMBI 40+ by complying with federal laws.

44.   Med-El breached its duty by failing to meet the standards set forth in the PMA process and other federal laws.

45.   Med-El breached its duty by failing to adhere to the standards required by the FDA, including the CGMP and QSRs.

46.   As a direct and proximate result of Med-El's negligence, Plaintiffs have been damaged.

### *COUNT 2 – Defective Product*

47.   Plaintiffs incorporate all of the above paragraphs.

48.   Med-El manufactured the COMBI 40+ and put it into the stream of commerce.

49.    There was no substantial change, modification, or alteration of the product after it left Med-El and was implanted into Yeahsen.

50.    Med-El's violations of the FDA's requirements and other federal regulations resulted in Yeahsen's COMBI 40+ being defective.

51.    The COMBI 40+ was defective as a result of one or more design, manufacturing, and/or assembly defects.

52.    Med-El knew or should have known that the COMBI 40+ was defective.

53.    Plaintiffs have been damaged by Med-El introducing this defective product into the stream of commerce.

## COUNT 3 – Misrepresentation

54.    Plaintiffs incorporate all of the above paragraphs.

55.    Med-El owed Plaintiffs a duty to disclose the known failures with the COMBI 40+.

56.    Med-El owed Plaintiffs a duty to disclose that cochlear implant patients had reported similar problems as Yeahsen reported and that these symptoms are signs of a failure.

57.    Med-El misrepresented that the COMBI 40+ was designed, manufactured, and sold in accordance with all federal regulations and FDA requirements.

58.    Med-El violated FDA regulations in reporting device failures.

59.    When the Med-El representative examined Yeahsen, the representative misrepresented that the device was working properly and did not notify Plaintiffs of the known failures of the COMBI 40+ that were causing similar injuries to other wearers.

- 13 -

60.    Med-El knew or should have known that Yeahsen's symptoms were indicative of the COMBI 40+ failing.

61.    Plaintiffs relied on each of Med-El's representations.

62.    Plaintiffs have been damaged by Med-El's misrepresentations.

### COUNT 4 – Breach of Express Warranties

63.    Plaintiffs incorporate all of the above paragraphs.

64.    Med-El issued a "Product Warranty & Service Contract" ("Warranty") for Yeahsen's implant.  A true and accurate copy of the Warranty is attached as Exhibit C.

65.    Yeahsen filed Med-El's "Manufacturers Warranty Registration Form."  A true and accurate copy of the form is attached as Exhibit D.

66.    Med-El also issued a "Client Bill of Rights and Responsibilities" ("Bill of Rights") that contains express warranties.  A true and accurate copy of the Bill of Rights is attached as Exhibit E.

67.    Med-El also made express warranties in its Package Insert.  Ex. A.

68.    Med-El breached its express warranties by representing that the COMBI 40+ was manufactured in accordance with FDA regulations and other federal regulations.

69.    Plaintiffs relied on these express warranties.

70.    The COMBI 40+ was defective.

71.    Med-El violated federal laws by breaching its express warranties and introducing this defective product into the stream of commerce.

72.    Plaintiffs have been damaged by Med-El's breach of its express warranty.

- 14 -

## IX.   DAMAGES

73.   As a direct and proximate result of Med-El's acts and/or omissions, Plaintiffs Lisa Latz John and Jimmy John have suffered (or will suffer) the following damages:

    a.   past and future medical expenses on behalf of Yeahsen;

    b.   past and future device expenses, including batteries;

    c.   past and future loss of earnings;

    d.   past and future travel expenses;

    e.   past and future therapy appointments; and

    f.   past and future educational expenses.

74.   As a direct and proximate result of Med-El's acts and/or omissions, Plaintiff Yeahsen Latz John has suffered (or will suffer) the following damages:

    a.   excruciating pain and mental anguish; and

    b.   loss of crucial language development time.

75.   Upon information and belief, a diagnosis of autism was missed because of the focus on Yeahsen's hearing issues.  Yeahsen also has lost the benefit of early treatment for autism.

## VIII.   Prayer for Relief

WHEREFORE, Plaintiffs Lisa Latz Condes and Jimmy John individually and as Next Best Friends of Yeahsen Latz John, a minor, pray that the Court enter judgment in their favor and against Med-El Corporation and Med-El Elektromedizinische Geräte:

    A.   requiring Defendants to reimburse Plaintiffs for their past damages, plus prejudgment interest;

    C.   requiring Plaintiffs to pay for all future damages;

E.   for all other compensatory damages to which Plaintiffs may be entitled;

F.   for pre-judgment interest; and

G.   for all other relief as this Court may deem proper.

Respectfully submitted,

Plews Shadley Racher & Braun LLP

Attorneys for Plaintiffs Lisa Latz Condes and
Jimmy John individually and as Next Best Friends
of Yeahsen Latz John, a minor

Brett E. Nelson (Atty. No. 22096-53)
bnelson@psrb.com
Tonya J. Bond (Atty. No. 24802-49A)
tbond@psrb.com
Plews Shadley Racher & Braun LLP
1346 North Delaware Street
Indianapolis, IN  46202-2415
P:  (317) 637-0700
F:  (317) 637-0781

- 16 -





## DEVICE DESCRIPTION

The COMBI 40+ Cochlear Implant System is a cochlear implant system consisting of the Implant C40+, all components of the CIS PRO+ Patient Kit, all components of the TEMPO+ Patient Kit, the DIB (Diagnostic Interface Box) System, the Detector Box, and the Surgical Kit. The implanted portion, the Implant C40+, is surgically implanted under the skin behind the ear. It consists of a ceramic housing, an active electrode array that is inserted into the cochlea during surgery, and a reference electrode, which is placed under the temporalis muscle. There are two patient kits for the COMBI 40+ Cochlear Implant System: the CIS PRO+ Patient Kit and the TEMPO+ Patient Kit. The function of the patient kits is basically the same. The major difference is that the TEMPO+ Speech Processor is a modular system, which can be worn entirely at ear level, and the CIS PRO+ Speech Processor is worn on the body.

For both devices, an external microphone picks up sound from the environment and sends it to the speech processor. The speech processor analyses the sound signal from the microphone according to the selected speech coding strategy, and transforms it into a coded electrical signal that is sent to the externally worn coil. This coded signal contains information about how to stimulate the individual electrodes so changes in pitch and loudness can be perceived. The coil, which is magnetically held in place over the implant, sends the coded signal across the skin to the implant package via an inductive link. The energy necessary for stimulation is also sent via the inductive link. The implant decodes the signal and sends a corresponding pattern of rapid stimulation pulses to the individual electrodes on the electrode array. These stimulation pulses travel along the auditory nerve to the brain, where the brain can categorize the sound and assign meaning. The COMBI 40+ Cochlear Implant System collects sound, processes the information, delivers instructions to the implant, and stimulates the electrodes with the appropriate pulse at a speed of up to 18,180 times per second. All electrode channels of the Implant C40+ are individually capacitively coupled to provide maximum protection against the accumulation of unintended Direct Current (DC)-charge.

42

## INDICATIONS FOR USE

The MED-EL COMBI 40+ Cochlear Implant System, hereinafter referred to as the COMBI 40+, is intended to provide the opportunity to detect and recognize auditory information through electrical stimulation of the auditory nerve for severe to profoundly hearing-impaired individuals who obtain little or no benefit from conventional acoustic amplification in the best-aided condition.

### The COMBI 40+ is indicated for the following patient populations:

Adults of eighteen (18) years of age or older who have bilateral, sensorineural hearing impairment and obtain limited benefit from appropriately fitted binaural hearing aids. These individuals typically demonstrate bilateral severe to profound sensorineural hearing loss determined by a pure tone average of 70 dB or greater at 500 Hz, 1000 Hz, and 2000 Hz. Limited benefit from amplification is defined by test scores of 40% correct or less in best-aided listening condition on CD recorded tests of open-set sentence recognition Hearing In Noise Test sentences (HINT).

Children aged eighteen (18) months to seventeen (17) years eleven (11) months must demonstrate a profound, bilateral sensorineural hearing loss with thresholds of 90 dB or greater at 1000 Hz. In younger children, little or no benefit is defined by lack of progress in the development of simple auditory skills in conjunction with appropriate amplification and participation in intensive aural habilitation over a three (3) to six (6) month period. In older children, lack of aided benefit is defined as < 20% correct on the Multi-syllabic Lexical Neighborhood Test (MLNT) or Lexical Neighborhood Test (LNT), depending upon the child's cognitive ability and linguistic skills. A three (3) to six (6) month hearing aid trial is required for children without previous experience with hearing aids. Radiological evidence of cochlear ossification may justify a shorter trial with amplification.

## INFORMATION FOR USE

### Surgical Considerations:

Complete surgical instructions can be found in the Surgical Manual. All surgeons planning to implant the Implant C40+ must read the Surgical Manual prior to performing the surgery. Surgeons must also be experienced in mastoid surgery and the facial recess approach. The following are some key points covered in the Surgical Manual:

- The most fragile points of a cochlear implant are the connections of different parts. In the case of the Implant C40+, the electrodes connect to the implant housing tangentially on the side of the housing to provide maximum reliability and support from bone underneath. The Implant C40+ package is the same for the left and right ear. To allow for the electrode to be guided toward the mastoid,

43

**PACKAGE INSERT: COMBI 40+ Cochlear Implant System**

The User Manual supplied with the COMBI 40+ is included with the Patient Kit.  It is important that users read and understand this manual completely.  It contains useful information for the COMBI 40+ and describes the user controls.

### Re-Programming - Adults

While you are getting acquainted with the new sensations of sound, your perception of loudness may change over time.  Larger changes are more common during the first few weeks following initial programming.  In addition, your hearing ability may change and a different processor setting or strategy may be of advantage.  Therefore, your implant center may require occasional programming adjustments and examination of the implant site.  These are usually most frequent during the first year following surgery.  After this, sessions normally occur annually.  On average, a programming session takes between one and three hours.

### Re-programming – Pediatric Patients/Guardians

Like all other cochlear implant systems, the settings of the speech processor will need to be readjusted or fine-tuned.  This is because the sensitivity of the hearing nerves changes over time as they begin to get accustomed to stimulation from the implant.  Your implant center will require that your child return at regular intervals to have the program and surgical site checked.  The regularity of these fitting sessions will be decided by your implant center.  On average, a programming session takes between one and three hours.  The sessions will be more frequent during the first year following surgery, and may be required annually thereafter.  Most patients need occasional adjustment of the program for as long as they use the implant.

### CONTRAINDICATIONS

The Implant C40+ must not be implanted in situations where there is acute or chronic middle ear pathology, lesions or agenesis of the 8th cranial nerve, pathologies of the central auditory pathway, or Michel deformity present.

The patient should not be implanted if the individual is known to be intolerant of the materials used in the implant, there is an absence of cochlear development, the tympanic membrane is perforated, deafness is attributed to central damage of the acoustic nerve or the central auditory pathway, or if external or middle ear infections are present.

### WARNINGS

44

WARNING: Implantees with the COMBI 40+ Cochlear Implant System should not be subjected to MRI, should not enter the MRI suite, or come into close proximity to the source of the magnetic field.  MRI involves the use of very strong magnetic fields, the effect of which could possibly dislodge the implant or demagnetize the internal implant magnet.

PACKAGE INSERT COMBI 40+ Cochlear Implant System

the housing must be placed at a different rotational angle for left and right ears, as indicated in the Surgical Manual.

- A well must be drilled for placement of the implant housing. Placement of the implant without drilling a recess into the bone must never be attempted, as it will almost certainly lead to eventual failure of the device.

- A channel must be drilled along the surface of the cranium to guide the active and the reference electrodes away from the implant housing and toward the mastoid cavity. Failure to drill a channel will likely result in premature electrode breakage.

- Please make sure to place the implant housing at sufficient distance from the mastoid cavity to allow for space for the TEMPO+ Speech Processor. A template is provided for guidance.

- The Implant C40+ electrode array has a slightly oval cross-section and was designed for ease of insertion and for deep placement in the scala tympani; and a suitable claw and forceps are provided for this purpose. In most cases where the scala tympani is free of obliteration, an insertion depth of ~ 31 mm should be accomplished. There is a silicone marker ring ~ 31 mm from the tip of the electrode, which should be up against the cochleostomy after insertion.

- The implant housing must be sutured to the skull, and care should be taken to assure that the suture does not cross over the electrodes.

- The Implant C40+ has a separate reference electrode lead. It is strongly recommended to place the reference electrode *under* the temporalis muscle onto the surface of the skull. Placement in or on top of the muscle will lead to gradual breakage of the reference electrode, which results in device failure. Please note that, depending on the type of incision you use, the reference electrode may pass underneath the incision.

We recommend the use of non-resorbable surgical suture for fixation of the implant package, and the use of suture, a titanium clip, or the split-bridge method for fixation of the electrode in the facial recess. The electrode array should be fixed so that no post-operative movement can occur.

After placement of the Implant C40+ housing and insertion of the electrode array, the position of the electrode array should be verified through radiology. An X-ray of the implanted ear is strongly recommended to verify electrode position in the cochlea.

**User Manual**

45

- Inaccurate placement of the active electrode array may prevent acoustic perception with the device, and may require additional surgery.

- Surgical risks include the following: infection, inflammation, necrosis, hematoma, leakage of Cerebro-Spinal Fluid (CSF), damage to the facial nerve, pain, scarring of the wound, risks relating to general anesthesia.

- Possible post-operative side effects include the following: loud or uncomfortable sounds, pain during stimulation, stimulation of the facial nerve requiring re-programming of the device, partial or total failure of the implant requiring device removal, increased tinnitus, increased vertigo, impairment of the sense of taste.

- Any residual hearing will probably be destroyed in the implanted ear.

- *Electroconvulsive Therapy* must not be used on patients who use cochlear implants. It could cause damage to neural tissues and/or destroy the implanted device.

- *Monopolar electrosurgical instruments, including cautery,* must not be used in the vicinity of the cochlear implant, as they can induce current levels in the implant electrodes that may cause damage to neural tissues and/or destroy the implanted device.

- *Diathermy* must not be used in an area close to the cochlear implant, as it may induce current levels in the implant electrodes that may cause damage to neural tissues and/or destroy the implanted device.

- *Ionizing Radiation Therapy* close to the cochlear implant may cause damage to the implant.

- Electrical stimulation of the inner ear may cause some long-term side effects that are not yet known. Significant clinical experience with cochlear implants exists only since the early 1980's, and the COMBI 40+ employs stimulation modes that may in some way be different from previous devices. In general, current and charge density levels and other stimulation parameters are contained to levels that were shown to be safe in chronic stimulation in animals or prior cochlear implant models in humans.

- Mechanical trauma to the implant, such as those that could result from a blow to the head in the vicinity of the implant package, could result in failure of the device.

46

PACKAGE INSERT: COMBI 40+ Cochlear Implant System

## PRECAUTIONS

- The speech processor is programmed to conform to each patient's individual needs. Patients must never use another person's speech processor because it is not suitable for them and may result in uncomfortably loud or unpleasant sensations.

- Some types of digital mobile phones may interfere with signals from the speech processor, and the speech processor may not work properly in conjunction with such devices.

- *Electrostatic Discharge* (ESD) may occur through either external or internal parts of the cochlear implant. The risk of ESD is particularly high in dry environments. Cochlear implant users should touch a metallic object before parts of the speech processor and its associated components come into contact with other surfaces or persons. ESD can corrupt the program that is stored in the speech processor and lead to temporary stimulation with loud and uncomfortable stimuli. The original program in the speech processor will in most cases be restored when the processor is turned off and back on. ESD may also cause damage to the implant itself, although it is highly unlikely.

- *Metal Detection Systems* and *Theft Detection Devices* may induce an electrical field in the cochlear implant, which can result in an audible sensation for some implant users. The materials used in the implant may activate the alarms on such devices. Cochlear implant patients are thus advised to always carry their Patient Identification Card.

- The cochlear implant or speech processor could in theory disturb airplane and other navigation systems. For this reason, the device should be considered like a personal computer and should be turned off before take-off and landing, as usually announced by airline personnel for electronic equipment.

- Please reference the appropriate device User's Manual for additional device specific general precautions.

## ADVERSE EVENTS AND COMPLICATIONS

All patients implanted in the United States with the Implant C40+ standard electrode array during the Investigational Device Exemption (IDE) trial were included in the safety analysis. A total of 188 patients have been followed for a total experience of 1266 months. Adverse events were classified as medical/surgical or device related. Complications were classified as major if they required surgical intervention and minor if they resolved spontaneously or with non-invasive medical treatment.

There were no internal device failures in children or adults during the study period.

47

PACKAGE INSERT: COMBI 40+ Cochlear Implant System

## ADULTS:

Twenty (20) patients out of one hundred and six (106) experienced twenty-two (22) adverse events or complications during the study period. One (1) event was classified as major because the resolution required revision surgery. The remaining twenty-one (21) events were classified as minor. All adverse events or complications have been resolved.

### Medical/Surgical Complications: Adults

One (1) patient reported uncomfortable stimulation and was re-implanted due to the frequency and severity of the symptoms (the implant was fully functional).

One (1) patient has experienced episodic vertigo accompanied by a sensation of fullness and tinnitus and has been diagnosed with vestibular neuritis. The patient recently reported that the symptoms are much better and the device is used up to twelve (12) hours per day.

One (1) patient was able to create an air pocket over the implant caused by vigorous nose blowing. This was resolved through counseling.

One (1) patient developed a facial weakness two weeks post-surgery. This was treated with steroids and anti-inflammatory medication, and resolved prior to first-fitting.

Two (2) patients developed post-operative swelling at the implant site which decreased over time. One (1) was treated with the use of additional magnets to hold the external coil in place. The other wore a headband.

One (1) device case was reversed in the bone bed, resulting in the external coil magnet repelling rather than attracting. The patient received an external coil that was modified by reversing the coil magnet.

### Device Related Adverse Events: Adults

Six (6) patients reported uncomfortable stimulation. Five (5) were resolved through reprogramming and exchange of external equipment. One (1) patient required a modified coil.

Two (2) patients reported a constant buzzing sound from the processor, one (1) of which experienced headaches and general discomfort.

One (1) patient reported a strong metallic taste sensation each time he stimulated the outer portion of his ear (example: water from shower in ear, finger touching ear canal).

48

PACKAGE INSERT COMBI 40+ cochlear implant system

Two (2) patients reported tinnitus.

One (1) patient reported a two-week period of dizziness post-operatively.

Two (2) patients experienced probable facial nerve stimulation.

One (1) patient experienced a tickling sensation in the ear.

## CHILDREN:

Nineteen (19) out of eighty-two (82) implanted children experienced nineteen (19) adverse events or complications. Three (3) were classified as major, requiring surgical intervention, [one (1) explantation and two (2) re-suturing], and sixteen (16) were classified as minor. All have been resolved.

Medical/Surgical Complications: Children

Two (2) patients presented with post-operative infection. They were treated with intravenous antibiotics and no further problems have been reported.

Three (3) patients presented with middle ear infections, which were resolved with medical treatment.

Three (3) patients' scalp incisions opened during the post-operative healing period. Two (2) of these required re-suturing. All incisions healed properly.

One (1) patient with a history of recurrent Acute Otitis Media (AOM) developed chronic otorrhea and granulation tissue. The patient was unsuccessfully treated with aggressive local management. The device has been explanted with subsequent re-implantation.

Two (2) patients had erythema at the implant site.

Device Related Adverse Events: Children

Three (3) children had facial nerve stimulation, which was resolved by programming.

Three (3) children had vertigo accompanied either by tinnitus or nausea.

One (1) child was only able to use five (5) stimulation channels.

One (1) child presented with skin irritation at the implant site as a result of continuing to wear a cracked coil.

49

## Potential Adverse Events: Adults and Children

In addition to the adverse events experienced during the clinical study, the following potential adverse events could occur:

### Risks due to surgery

Cochlear implantation is subject to the same risks as other surgical procedures conducted under general anesthesia. In addition, surgery may result in loss of residual hearing in the implanted ear, facial nerve injury, taste disturbances, infection, incorrect device placement and pain at the site of the wound.

### Potential side effects and medical complications

Cochlear implantation may result in a palpable lump behind the ear, numbness or stiffness in the area of the implant, leakage of perilymph fluid, tinnitus (ringing in the ear), vertigo (dizziness), risk of meningitis due to perilymph fluid leak, irritation, inflammation or breakdown of the skin with possible device extrusion.

### Risks related to the device

Risks associated with implantation may include a device may not restore hearing to a level achieved by other cochlear implant users, facial stimulation and further degeneration in inner ear nerve cells. Long-term effects of stimulation of the hearing nerve with a cochlear implant are not fully known to date.

### Device removal

Device removal may become necessary because of electrical or mechanical failure of the implant, an infection at the site of the surgical wound or at the site of the device that can not be successfully treated with medication, or because of migration of the device or the electrode carrier which may result in uncomfortably loud stimulation, no sound, or a reduction of the number of electrodes in use. There is a risk that removal of the cochlear implant may cause damage to the inner ear.

## RESULTS OF THE US CLINICAL TRIAL

Study Population and Study Period:

### ADULTS:

One-hundred and six (106) adults were implanted with the Implant C40+ standard electrode array at twenty-six (26) sites in the United States between November 10, 1997 and September 29, 2000. The cumulative experience was 713 months. Data from forty-five (45) post-lingually deafened and eighteen (18) pre-lingually deafened

50

patients who have at least six (6) months device experience were used to support device efficacy. Thirty-five (35) patients have not been seen for the six (6) month follow-up, five (5) patients did not meet the inclusion criteria for the investigational protocol, and three (3) patients were exempted due to health issues or inability to comply with the protocol requirements.

**CHILDREN:**

Eighty-two (82) children were implanted with the Implant C40+ standard electrode array at eighteen (18) sites in the United States between April 1, 1998 and March 1, 2000. The cumulative implant experience was 553 months. Data from fifty-five (55) subjects who have at least six (6) months device experience were used to support device efficacy. Of these, thirty-four (34) were younger than five (5) years and twenty-one (21) were older than five (5) years of age. Eighteen (18) subjects had not reached the six (6) month follow-up, four (4) patients did not meet the inclusion criteria for the investigational protocol, and five (5) patients were exempted due to health issues or inability to comply with the protocol requirements.

**SAFETY PROTOCOL:**

In addition to the monitoring of all complications and adverse events, fifty (50) children and fifty (50) adults with a minimum of one (1) year device experience were used to evaluate device safety. These were comprised of fifty (50) US children, forty (40) US adults, and ten (10) European adults. The analysis for the fifty (50) US pediatric and forty (40) US adult patients was comprised of evaluating the stability of the threshold (THR) charges, the most comfortable level (MCL) charges and the dynamic range, the stability or increase of auditory perceptual measures over time, medical/otological evaluation, and monitoring of adverse events.

The safety data analysis for the ten (10) European adults consists of the evaluation of the stability of the threshold (THR) charges, and the most comfortable level (MCL) charges and dynamic range over time using initial stimulation (one (1) month), and post one (1) year data points.

Electrode Channel Activation

The following tables represent the number of electrode channels versus stimulation rate per channel for the COMBI 40+ clinical study adult and pediatric patients. Data displayed represents only those parameters selected by patients in the clinical trial.

51

PACKAGE INSERT — COMBI 40+ Cochlear Implant System

| Adult: Evaluation 4 (6 months post initial fitting) N=38 | | | | |
|---|---|---|---|---|
| **Stimulation Rate Per Channel in Pulses Per Second (PPS)** | | | | |
| Active Channels | 501-1250 | 1251-1750 | 1751-2500 | 2501-3500 |
| 6 |  |  |  | ●● |
| 7 | ● |  |  |  |
| 8 |  |  | ● |  |
| 9 | ● |  | ●●●●●● |  |
| 10 | ● | ● | ● |  |
| 11 | ● | ● |  |  |
| 12 | ●●●●●●● | ●●●●●●● ●●●●●●● ● |  |  |

| Pediatric: Evaluation 4 (6 months post initial fitting) N=49 | | | | |
|---|---|---|---|---|
| **Stimulation Rate Per Channel in Pulses Per Second (PPS)** | | | | |
| Active Channels | .501-1250 | 1251-1750 | 1751-2500 | 2501-3500 |
| 5 |  |  |  | ● |
| 7 |  | ● | ● |  |
| 8 | ● |  | ●●● |  |
| 9 |  |  | ●●●● |  |
| 10 |  | ● | ● |  |
| 11 |  | ●●●●●● |  |  |
| 12 | ● | ●●●●●●● ●●●●●●● ●●●●●●● ●●●●●●● ● |  |  |

As exhibited in the above tables, the investigational subjects received different rates of stimulation measured in pulses per second (PPS). For each participant the optimal stimulation rate per channel is displayed along the x-axis and the optimal number of active channels is displayed along the y-axis. The number of active channels affects the stimulation rate per channel. None of the patients selected programs with less than 5 channels, resulting in no programs with rates higher than 3,500 pps per channel.

52

## STUDY OUTCOMES AND STATISTICAL CONSIDERATIONS

### ADULTS:

Device efficacy was defined as improved scores on speech recognition materials presented at conversational speech levels (70 dB SPL) in quiet in the auditory-only condition, as measured by the Hearing In Noise Test (HINT) sentence test. Device efficacy was evaluated using a single subject repeated measures design, with the subject serving as his/her own control. This method optimizes control over inherent variability among subject and disease characteristics. No attempt was made at blinding either the patients or the clinicians. Statistical analysis was performed on each speech recognition measure for all subjects comparing the best-aided pre-surgical condition to six (6) months experience with the COMBI 40+. Trends in impedance levels and fitting parameters, in addition to the monitoring of all adverse events, were analyzed to support device safety.

Sentence recognition materials presented using sound alone at normal conversational levels in quiet are considered to provide a standard clinical measure of everyday performance. It is generally agreed that an improvement as compared to the best-aided pre-surgical score of 20 percentage points on these materials represents a clinically significant increase in performance. Therefore, patients experiencing an increase of 20% or more on this measure were classified as exhibiting *clinically significant improvement.*

Many patients with poor open-set speech understanding derive clear subjective benefit in their daily lives from cochlear implantation. Therefore, patients demonstrating an increase on sentence recognition materials of less than 20% and an improvement in any other test are defined as *some improvement.*

### Adult Data:

Data from forty-five (45) post-lingually deafened patients and eighteen (18) pre-lingually deafened patients with six (6) months device experience with the COMBI 40+ were used to substantiate device efficacy. The performance at six (6) months device experience was compared to the pre-operative best-aided hearing condition with appropriately fitted hearing aids.

The following tests were administered pre-operatively and at six (6) months device experience. All speech recognition tests were administered from CD recording at 70 dB SPL.

55

PACKAGE INSERT: COMBI 40+ Cochlear Implant System

- 4-choice spondee words     CD Recording
- Sentences in quiet     HINT sentences, CD recording
  City University of New York
  (CUNY) sentences, CD recording
- Sentences in noise     HINT sentences at 10dB SNR, CD
  Recording
- Monosyllabic words     Consonant-Nucleus-Consonant
  (CNC) words, CD recording
- Sentences via telephone    Central Institute for the Deaf
  (CID) sentences, live voice

## Post-lingually Deafened Adults

The average age at implantation for the forty-five (45) post-lingually deafened patients was 53.5 years. These patients had a mean duration of hearing loss of twenty-eight (28) years.

At six (6) months experience with the COMBI 40+, post-lingual adults with hearing loss less than twenty-five (25) years (N=18) demonstrated:

- a mean increase in the ability to recognize words in CUNY sentences in quiet of 72% above their pre-operative score.
- a mean score of 86% on CUNY in quiet.
- a mean increase in the ability to recognize words in HINT sentences in quiet of 70% above their pre-operative score.
- a mean score of 75% on HINT scores in quiet.
- a mean increase in the ability to recognize words in HINT sentences in the presence of +10 dB SNR background noise of 61%.
- a mean score of 63% on HINT sentences in the presence of background noise.
- a mean increase in the ability to recognize CNC monosyllabic words of 40%.
- a mean score of 44% on CNC monosyllabic words.
- a mean increase in the ability to recognize CID sentences over the telephone of 68%.
- a mean score of 68% on CID sentences over the telephone.

At six (6) months experience with the COMBI 40+, post-lingual adults with hearing loss greater than twenty-five (25) years (N=27) demonstrated:

- a mean increase the ability to recognize words in CUNY sentences in quiet of 56% above their pre-operative score.
- a mean increase in the ability to recognize words in HINT sentences in quiet of 50% above their pre-operative score.

54

- a mean increase in the ability to recognize words in HINT sentences in the presence of +10 dB SNR background noise of 41%.
- a mean increase in the ability to recognize CNC monosyllabic words of 29%.
- a mean increase in the ability to recognize CID sentences over the telephone of 42%.

## Pre-lingually Deafened Adults

The average age at implantation for the eighteen (18) pre-lingually deafened patients was 37.4 years. These patients had a mean duration of hearing loss of 36.5 years. At six (6) months experience with the COMBI 40+, Pre-lingually Deafened adults, (N =18), range birth to 42[note 1] years, profoundly deafened prior to 6 years of age) demonstrated:

[note 1] The upper limit of forty-two (42) years is for those cases when hearing loss was documented upon inclusion into the clinical trial. In all cases it has been found that these patients were deafened at birth, or prior to the age of six (6) due to maternal measles, maternal meningitis, or other congenital reasons.

- a mean increase in the ability to recognize words in CUNY sentences in quiet of 21% above their pre-operative score.
- a mean increase in the ability to recognize words in HINT sentences in quiet of 19% above their pre-operative score.
- a mean increase in the ability to recognize words in HINT sentences in the presence of +10 dB SNR background noise of 12%.
- a mean increase in the ability to recognize CNC monosyllabic words of 10%.
- a mean increase in the ability to recognize CID sentences over the telephone of 20%.

## Length of Deafness Summary for Post-Lingually Deafened Adults

As a combined group (< twenty-five (25) years deafened  (N=18) and > twenty-five (25) years deafened (N=27) populations), eighty-five (85) percent demonstrated clinically significant improvement defined as an increase on open set sentence tests of over 20% and all but one (1) demonstrated some improvement.  When both recorded sentence tests included in the audiologic battery are considered (20% improvement on HINT in quiet or CUNY sentences), 91% of subjects achieved a 20% improvement on one or both of the test scores.

Following at least six (6) months of device usage, twenty-six (26) patients had the fitting of their TEMPO+ Speech Processor optimized with the DIB.  After thirty (30) days with the new program, speech-understanding results on CUNY sentences in quiet and CNC words with the TEMPO+ Speech Processor were compared to the CIS PRO+ Speech Processor.  Although the mean values for the TEMPO+ Speech

55

Processor are higher than the CIS PRO+ Speech Processor, the difference was not statistically significant.

Eighty-four (84) percent of the subjects (N = 45) report that the implant has 'quite positively' (40%) or 'very positively' (44%) affected their lifestyle. Responses on the "Quality of Life" questionnaire demonstrated the following statistically significant improvements after six (6) months device experience as compared to the pre-operative condition:

- COMBI 40+ adult recipients are less concerned about their safety or welfare because of their deafness.
- They do not change their activities as much due to concerns about their safety of welfare because of their deafness.
- They are less often upset because they are deaf.
- Their deafness does not affect enjoyment of social events as much.
- They are more comfortable attending social events.
- They feel less isolated as a result of their deafness.
- Their deafness does not affect their sense of belonging as much.
- They find it easier to visit a store or restaurant alone.
- It is easier for them to communicate.
- It is less frustrating for them to communicate.
- The quality of their closest relationship is less affected by their deafness.
- They do not feel left out of conversations with family members as much.
- Their relationships with friends are more satisfying.
- Their relationships with friends are less affected by their deafness.
- Their performance at work was less affected by their deafness.
- Deafness did not alter their hobbies or recreational activities as much.
- They more often engaged in activities that usually require hearing (watching TV, attending sporting events).
- Their lifestyle is less affected by their deafness.

Although most of the instrument items do not demonstrate statistically significant improvements in quality of life for the pre-lingually deafened patients, probably due to limited power related to the small sample, responses to most of the items are more favorable at six (6) month post implant as compared to pre-surgical. After six (6) months of experience with the Implant C40+, 83% of these subjects (N = 18) reported that the device 'very positively' (50%) or 'quite positively' (33%) affected their lifestyle.

CHILDREN:

Device efficacy was defined as improved performance on any measure of the speech perception battery in quiet after six (6) months of device use as compared to the best-aided pre-surgical condition on age-appropriate measures. Because children express improvement in speech recognition differently due to age,

56

maturation, language and cognitive development, a different test battery was used for younger children (ages eighteen (18) months through four (4) years eleven (11) months) than for older children (ages five (5) years through seventeen (17) years eleven (11) months). In addition to speech perception measures, the Meaningful Auditory Integration Scale (MAIS) and the Infant Toddler Meaningful Auditory Integration Scale (IT-MAIS) was administered as a measure of the child's ability to integrate auditory information into daily routines, enabling evaluation of children who have difficulty taking standardized tests due to maturational factors. Sound-field warble tone, speech detection and speech recognition thresholds were measured to complement the assessment of auditory performance. An auditory skills checklist was also administered and evaluated. Clinical safety was supported by monitoring of all adverse events and analysis of stability of electrode impedances, fitting parameters and auditory perceptual measures over time.

The primary measure of efficacy is a single test of binomial proportions to test that the Med-El COMBI 40+ Cochlear Implant System improved performance on any measure of the speech perception battery in quiet after six (6) months of device use compared to the best-aided pre-surgical condition on age-appropriate measures. As a secondary set of analyses, group scores are compared using a Student's Paired t-Test for each audiologic measure at pre-surgical compared with the six (6) month evaluation. In addition, poolability of data across investigational sites and audiological performance over time are analyzed using repeated measures analysis of variance (RM-ANOVA) models, including terms for investigational site and time in the statistical models. Due to the multiplicity of assessments (i.e., 10 in older children, 5 in younger children), statistical significance of the primary analysis of the single test of proportions test is considered $0.05 / 10 = 0.005$ for older children, and $0.05 / 5 = 0.01$ for younger children. A two-sided alpha level of 0.05 is considered statistical significant for all statistical hypothesis tests in the secondary analyses. Descriptive statistics are supplied for each test according to the age group to fully characterize the outcome of all the study participants.

**Younger children:**

Children who enter the study as a member of this age category (ages eighteen (18) months through four (4) years eleven (11) months) continued with the same protocol throughout the study even if they exceeded the age of five (5) during the follow-up period. The mean age for this group was 2.9 years.

*All of the following test measures were administered pre-operatively and at six (6) months device experience with the COMBI 40+ for the younger children who were capable of taking the tests.* All live-voice test administration was monitored with a sound-level meter at 70 dB SPL. All recorded tests were administered at 70 dB SPL.

- IT-MAIS Parent Interview.

57

- Early Speech Perception (ESP) test Low Verbal Version administered live-voice.

- Glendonald Auditory Screening Procedure (GASP) Words administered live voice. The GASP could not be administered immediately following the ESP standard pattern perception subtest because of shared vocabulary.

- Auditory Skills Checklist was completed by the child's therapist (must have been a certified audiologist, speech language pathologist, or auditory-verbal therapist).

Of the younger children who were capable of being tested on open-set word recognition tasks:

- 70 % (16/23) demonstrated improvement on the ESP low verbal pattern perception test.
- 50 % (10/20) demonstrated improvement on the ESP low verbal spondee identification test.
- 48 % (10/21) demonstrated improvement on the ESP low verbal monosyllabic word identification test.
- 57 % (12/21) demonstrated improvement on the GASP open set word test.

IT-MAIS parental questionnaire:

- All younger children who were tested (33/33) improved on the IT-MAIS as an overall score.
- As a group, the younger children significantly improved on all questions of the IT-MAIS:

  - 76% (25/33) of the children frequently or always responded to their name in quiet compared with 15% (5/33) pre-operatively.
  - 52% (17/33) of the children frequently or always responded to their name in noise compared with 3% (1/33) pre-operatively.
  - 67% (22/33) of the children frequently or always spontaneously alerted to environmental sounds compared with 6% (2/33) pre-operatively.
  - 45% (15/33) of the children frequently or always alerted to new sounds when in an unfamiliar surrounding compared with 0% (0/33) pre-operatively.
  - 67% (22/33) of the children frequently or always recognized or responded appropriately to sounds in the classroom and at home compared with 3% (1/33) pre-operatively.
  - 52% (17/33) of the children frequently or always were able to discriminate between two speakers using audition alone compared with 6% (2/33) pre-operatively.

58

- 67% (22/33) of the children frequently or always recognize speech as different than non-speech sounds compared with 6% (2/33) pre-operatively.
- 55% (18/33) of the children frequently or always were able to associate vocal tone (anger, excitement) with its meaning as compared to 12% (4/33) pre-operatively.

**Older Children:**

Children aged five (5) years through seventeen (17) years eleven (11) months. Children in this group had a mean age at implantation of 8.8 years.

*All of the following test measures were administered pre-operatively and at six (6) months device experience with the COMBI 40+ for the older children who were capable of taking the tests.* All live-voice test administration was monitored with a sound-level meter at 70 dB SPL. All recorded tests were administered at 70 dB SPL. The following measures have been used to establish device efficacy:

- MAIS Parent Interview

- ESP Standard Version administered live voice

- Multisyllabic Lexical Neighborhood Test (MLNT), Level 1 recorded version

- Lexical Neighborhood Test (LNT), Level 1 recorded version

- GASP Words administered live voice

- Barnford-Kowal-Bench (BKB) Sentences recorded version

- Auditory Skills Checklist to be completed by the child's therapist (must have been a certified audiologist, speech language pathologist, or auditory-verbal therapist).

Of the older children who were capable of being tested on open-set word recognition tasks:

- 68% (13/19) demonstrated improvement on the ESP standard pattern perception test.
- 79% (15/19) demonstrated improvement on the ESP standard spondee identification test.
- 68% (13/19) demonstrated improvement on the ESP standard monosyllabic word identification test.
- 79% (15/19) demonstrated improvement on the GASP open set word test.

59

PACKAGE INSERT: COMBI 40+ cochlear implant system

- 63% (12/19) demonstrated improvement on the LNT word test.
- 89% (17/19) demonstrated improvement on the LNT phonemes test.
- 65% (11/17) demonstrated improvement on the MLNT words test.
- 82% (14/17) demonstrated improvement on the MLNT phonemes test.
- 53% (10/19) demonstrated improvement on the BKB sentence test.

## MAIS parental questionnaire:

- All older children who were tested (20/20) improved on the MAIS as an overall score.
- As a group, the older children significantly improved on all questions of the MAIS:

  - 95% (19/20) of the children frequently or always responded to their name in quiet compared with 55% (11/20) pre-operatively.
  - 80% (16/20) of the children frequently or always responded to their name in noise compared with 25% (5/20) pre-operatively.
  - 80% (16/20) of the children frequently or always spontaneously alert to environmental sounds in the home compared with 25% (5/20) pre-operatively.
  - 70% (14/20) of the children frequently or always alerted to new sounds when in an unfamiliar surrounding compared with 25% (5/20) pre-operatively.
  - 75% (15/20) of the children frequently or always responded recognized or responded appropriately to sounds in the classroom and at home compared with 45% (9/20) pre-operatively.
  - 65% (13/20) of the children frequently or always were able to discriminate between two speakers using audition alone compared with 40% (8/20) pre-operatively.
  - 70% (14/20) of the children frequently or always recognize speech as different than non-speech sounds compared with 45% (9/20) pre-operatively.
  - 55% (11/20) of the children frequently or always were able to associate vocal tone (anger, excitement) with its meaning as compared to 25% (5/20) pre-operatively.

## Communicative Skills Checklist (older and younger children):

The terms "sometimes", "often" and "always" refer to responses at the 25%, 50% and 75%+ level, respectively.

- 84% (42/50) of the children often or always searched for the sound source compared to 34% (17/50) pre-operatively.

60

PACKAGE INSERT: COMBI 40+ Cochlear Implant SYSTEM

- 80% (40/50) of the children often or always identified a sound source compared to 34% (17/50) pre-operatively.
- 62% (31/50) of the children were able to discriminate intensity differences often or always compared to 36% (18/50) pre-operatively.
- 80% (40/50) of the children were able to discriminate durational cues often or always compared to 50% (25/50) pre-operatively.
- 68% (34/50) of the children were able to discriminate pitch differences often or always compared to 28% (14/50) pre-operatively.
- 76% (38/50) of the children were able to respond to sounds at a distance often or always compared to 22% (11/50) pre-operatively.
- 72% (36/50) of the children were often or always able to associate a familiar sound with its meaning or anticipated event compared to 26% (13/50) pre-operatively.
- 64% (32/50) of the children were often or always able to improve their speech.
- 56% (28/50) of the children were able to respond to simple directions often or always using audition alone compared to 26% (13/50) pre-operatively.
- 36% (18/50) of the children were often or always able to identify and comprehend speech in a noisy environment without lip reading compared to 8% (4/50) pre-operatively.
- 24% (12/50) of the children were able to understand a message from an electronic sound source such as radio or film compared to 6% (3/50) pre-operatively.

Patient Counseling Information:

Prospective cochlear implant patients must be properly counseled prior to surgery, and expectations must be realistic. Information for prospective patients is available upon request from MED-EL. Expected performance with the cochlear implant cannot be accurately predicted. Duration of deafness, age at implantation, primary communication mode, communicative ability and the patient's auditory environment all have an impact on success with the cochlear implant. There may be other unknown factors, which also mitigate success with an implant. The professionals at a cochlear implant center are the best source of information regarding the expected outcome following implantation. It is also imperative that the patient and/or parents fully understand the risks associated with the procedure and the requirements for long-term follow-up care.

The final decision on ear selection remains at the discretion of each clinic. However, the ear with the least obstruction to full electrode insertion should be considered.

Pre-lingually deafened adults may not demonstrate the same degree of benefit as post-lingually deafened adults. There is potential for awareness and recognition of environmental sounds, enhanced lip-reading capabilities, improvement in voice

61

PACKAGE INSERT COMBI 40+ Cochlear Implant System

monitoring and speech production and in some instances the ability to understand speech without lip-reading.

Pre-lingually deafened adult patients should be counseled regarding the limited benefit that they may receive from cochlear implantation. These patients must be highly motivated because they tend to be more likely to discontinue cochlear implant use.

## STERILIZATION AND SHELF LIFE:

The Implant C40+ has been exposed to a validated Ethylene Oxide (EO) sterilization cycle and is delivered in a sterile package. It has a shelf life of at least two (2) years. If the expiration date marked on the package has expired, the device must be returned to the manufacturer for possible re-sterilization before being implanted.

Please note that the implant is double-packaged in two (2) transparent packages. Examine the sterile packages to make sure that the welded seams are intact. If the seams are not intact, or if you suspect that sterility has otherwise been compromised, the implant should not be used.

## STORAGE AND HANDLING:

Unused Implants C40+ should be stored in the outer transportation carton at normal humidity and temperature in the range of 50°F - 80°F. Avoid temperature extremes below 32°F or above109°F.

*EXERCISE CAUTION AT ALL TIMES WHILE HANDLING THE STERILE PACKAGE, OPENING THE PACKAGE, OR HANDLING THE IMPLANT!* Do not implant a device that has been dropped. Return it to the manufacturer for replacement, and use a backup device instead.
Please note that the implant contains a high intensity magnet within the ceramic housing.

*TO OPEN THE STERILE PACKAGE PLEASE USE THE FOLLOWING PROCEDURE (PLEASE CHECK LABELING FOR PACKAGE CONTENT):*

- Do not use the implant if the packaging is damaged.

- Do not open package until needed during surgery.

- Caution -- Do not drop!
- Caution -- Implant is magnetic!

- Contaminated, non-sterile implants cannot be re-sterilized.

62

**PACKAGE INSERT: COMBI 40+ Cochlear Implant System**

<u>The sterile Implant package consists of:</u>

1	**outer package with sealed Tyvek lid (1)**



1	**inner package with sealed Tyvek lid (2)**



1	**implant holding tray (3)**
1	**plastic tube (4) (electrode protection)**



Both packages are opened by peeling off the Tyvek Lid (see labeling: "Open here")



## STEP 1: HOW TO OPEN THE OUTER PACKAGING

•	Check labeling for package content and peel off and dispose of the Tyvek lid.

63

PACKAGE INSERT COMBI 40+ Cochlear Implant System



- Place one hand over the inner packaging and turn the packaging over (upper part down).



- Remove and dispose of the outer packaging (transparent).

## STEP 2: HOW TO OPEN THE INNER PACKAGING

- Peel off and dispose of the Tyvek lid.



- Place one hand over the black-tinted Implant holding tray and turn the packaging over (upper side down).

- Gently squeeze the Implant holding tray out of its packaging onto a flat surface.

64



- Dispose of the inner packaging (transparent).

- Hold the implant at the finger access and horizontally pull the electrode out of the protective plastic tube.

     

- Dispose of the implant holding tray (black-tinted) and the plastic tube.

Never lift, hold, suspend or carry the Implant C40+ by the electrode!  This may result in unseen damage to the electrode contacts or the leads within the electrode, and cause complete device failure.  Hold the Implant C40+ by the ceramic body only.

Use only the Surgical Templates when fitting and measuring for the position of the implant and electrodes on the patient's skull.  Handle the electrode only with the surgical instruments provided in the Surgical Kit.  Place the actual implant only when certain that it will not need to be replaced or re-positioned.

65

PACKAGE INSERT COMBI 40+ Cochlear Implant System

---

**Caution:  Federal (US) law restricts this device to sale, distribution and use by or on the order of a physician.**

---

<u>Contact Information</u>
MED-EL Corporation
2222 East Highway 54
Suite B-180
Durham, NC 27713
Telephone: 919-572-222
Toll Free: 1-888-633-3524
Fax: 919-484-9229

66

# USER MANUAL FOR THE
## MED-EL TEMPO+
## EAR LEVEL SPEECH PROCESSOR

Manufacturer:

MED-EL™ Corporation

2222 East Highway 54 Suite B180

Durham, NC

27713 USA

Tel: (919) 572-2222

Fax: (919) 484-9229

AW2934 Rev. 1.0

67


# FDA U.S. Food and Drug Administration

## Inspections, Compliance, Enforcement, and Criminal Investigations
## MED-EL E?EKTRO-MEDIZINISCHE GERATE GmbH 16-Nov-04

Department of Health and Human Services' logo Department of Health and Human Services

Public Health Service
Food and Drug Administration

Center for Devices and
Radiological Health
2098 Gaither Road
Rockville, MD 20850

NOV 16 2004                    WARNING LETTER

FEDERAL EXPRESS

Dr. Ingeborg Hochmair
CEO
MED-EL ELEKTRO-MEDIZINISCHE GERATE GmbH
Furstenweg 77a, A-6020
Innsbruck, Austria

Dear Dr. Hochmair:

During inspections of your firms, MED-EL ELEKTROMEDIZINISCHE GERATE GmbH, located in Innsbruck, Austria on June 7 through June 16, 2004, our investigators determined that your firms manufacture cochlear implant systems. Cochlear implants, such as the COMBI C40+, the PULSAR, are devices within the meaning of section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act)(21 U.S.C. 321(h)).

These inspections revealed that your devices appear to be adulterated within the meaning of section 501(h) of the Act (21 U.S.C. 351(h)), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the Current Good Manufacturing Practice (CGMP) requirements of the Quality System (QS) regulation found at Title 21, Code of Federal Regulations (CFR), Part 820. Significant violations include, but are not limited to, the following:

1. Failure to establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met, as required by 21 CFR 820.30 (a)(1). For example, procedures to control the design process for the device were not implemented. [redacted] was not implemented. The requirements for design control were not used and design control procedures were not followed for the product change ([redacted] from a thick film to thin film product. There was also a change in components (materials) which resulted in changes to the finished product.

2. Failure to establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation, as required by 21 CFR 830.30(i). For example, the firm failed to implement Quality System regulation design control requirements for changing the ceramic housing assembly components ([redacted]). . Your firm failed to provide documentation for design and development planning, design input, design output, design review, design verification, design transfer, and design history file for changing the [redacted]. Your firm's Standard Operating Procedure for Design Control ([redacted]), page 9, does not provide enough detail to meet the requirements in 21 CFR 820.30(i).

3. Failure to maintain procedures to ensure that the design requirements relating to a device are appropriate and address the intended use of the device including the needs of the user and patient. The procedure shall include a mechanism for addressing incomplete, ambiguous, or conflicting requirements. The design input requirements shall be documented and shall be reviewed and approved by a designated individual(s), as required by 21 CFR 820.30(c). For example, the SOP, [redacted] including [redacted] and [redacted] was not followed. The [redacted] process was used to change the C40+ housing assembly from a "thick" to "thin" film. There were no design input requirements for changing the product characteristics/specifications-material, and material thickness changes to [redacted]. There are no design input requirements/specifications for [redacted] specifications and [redacted] (e.g. [redacted], [redacted] test, [redacted], [redacted] and [redacted] test).

4. Failure to establish and maintain procedures for validating the device design, as required by 21 CFR 820.30(g). For example, Design Verification/Validation [redacted] was not followed. There was no verification or validation (V&V) plan. Review and approval of the V&V plan before various verification activities were not conducted on the "[redacted]" products. Your firm did not place in-coming requirements on the [redacted], i.e. thickness or

chemical uniformity and distribution from [redacted]

5. Failure to establish and maintain a DHF for each type of device. The DHF shall contain or reference the records necessary to demonstrate that the design was developed in accordance with the approved design plan and the requirements, as required by 21 CFR 820.30(j). For example, design control procedure [redacted] was not implemented. Your firm failed to have a design history file for the change of materials in the [redacted] housing assembly and changes from using a thick film to a thin film process.

6. Failure to establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements. Design output procedures shall contain or make reference to acceptance criteria and shall ensure that those design outputs that are essential for the proper functioning of the device are identified, as required by 21 CFR 820.30(d). For example, your firm failed to have design input requirements other than a [redacted] test from which acceptance criteria for design output could be identified. To control the manufacturing of a product, your firm must have detailed product and/or process specifications. Any product manufactured under controlled conditions must have detailed product specifications or detailed manufacturing process specifications. MED-EL fails to have product specifications or manufacturing process specifications for the [redacted] of the [redacted].

7. Failure to establish and maintain procedures to ensure that the device design is correctly translated into production specifications, as required by 21 CFR 820.30(h). For example: (a) the new design using the [redacted] for the thin film technology was not validated before being implemented; (b) [redacted] has not been completed; (c) the thin film C40+ housing assembly and the [redacted] and/or the process for the [redacted] has not been characterized; and (d) design input requirements were not predetermined for transfer into production.

8. Failure to establish and maintain data that clearly describe or reference the specified requirements, including quality requirements, for purchased or otherwise received product and services, as CFR 820.50(b). For example, MED-EL's [redacted] to [redacted] for purchase of the [redacted] housing assembly manufactured with a [redacted] lacks specific specifications regarding the [redacted] and/or specification for the [redacted] used to apply the [redacted].

9. Failure to establish and maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements. Each manufacturer shall establish and maintain the requirements, including quality requirements that must be met by suppliers, contractors, and consultants. Each manufacturer shall evaluate and select potential suppliers, contractors, and consultants on the basis of their ability to meet specified requirements, including quality requirements. The evaluation shall be documented, as required by 21 CFR 820.50(a)(1). For example, review of the "[redacted]" (supplier name was blank) dated August 17, 2001, failed to reference any [redacted] requirement for the supplier to meet the Quality System regulation. Changes to quality elements were mentioned, but requirements to meet the Quality System regulation were not mentioned. Product and manufacturing methods were discussed on the acceptance of returned products, which failed to comply with the Purchase Order or other written agreements specifications. However, your firm failed to provide specifications or manufacturing methods identified for the [redacted] or method for applying the [redacted]. Although your firm performs supplier audits, there are no product and/or process operating specifications for the [redacted] Your firm failed to provide specific requirements that the supplier must meet in joining the [redacted] to the [redacted].

10. Failure to adequately maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements, as required by 21 CFR 820.50. For example, review of SOP, [redacted] dated [redacted], showed the [redacted], or designee, is responsible for completing the [redacted] Agreement. This procedure lacked specific instructions for [redacted] for a [redacted] to have a [redacted] requirement for a [redacted] to comply with the Quality System regulation.

11. Failure to define the type and extent of control to be exercised over the product, services, suppliers, contractors, and consultants, based on the evaluation results as required by 21 CFR 820.50(a)(2). For example. [redacted] dated [redacted], showed that the [redacted] lacked process-operating and [redacted] which are required to produce and control the quality of the [redacted].

12. Failure to establish and maintain procedures for acceptance of incoming product. Incoming product shall be inspected, tested, or otherwise verified as conforming to specified requirements. Acceptance or rejection shall be documented, as required by 21 CFR 820.80(b). For example, procedures for acceptance or rejection of incoming products were not complete. Your firm failed to sample and conduct routine testing of the [redacted] between the [redacted] and the [redacted]. These tests may not include [redacted] test such as [redacted] and other tests.

13. Failure to establish and maintain procedures for analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistica methodology shall be employed where necessary to detect recurring quality problems, as required by 21 CFR 820.100(a)(1). For example, there is no procedure addressing the data entry requirements for transferring information from complaint files to the electronic complaint database. The database is used for data analysis. All essential information from complaints and failure analysis information contained within each complaint was not transferred to the electronic complaint database.

14. Failure to establish and maintain procedures for investigating the cause of nonconformities relating to product processes, and the quality system, as required by 21 CFR 820.100(a)(2). For example:

(a) a "loss of hermeticity," can cause failure of the [redacted] that could result in [redacted] Your firm failed to test explanted devices for DC leakage that were confirmed to have "Loss of Hermeticity" and the [redacted] out of specification. DC leakage was determined to be a critical specification in your firm's risk analysis for cochlear implants.

(b) Review of [redacted] showed that the facts did not support the conclusion that device failure could be related to an accident from trauma to the forehead area. There was no failure analysis information showing any failure attributable to stress on the device. The device failure analysis showed failure was due to "Loss of Hermeticity." There was no indication that the root cause of the hermeticity problem was different than the already established thick film process [redacted] reliability problems.

15. Failure to adequately maintain procedures for implementing corrective and preventive action, and failure to document all activities and results under this section, as required by 21 CFR 820.100(b). For example, [redacted] were reported to have been identified using a Scanning Electron Microscope(SEM) for element analysis. The test method and test [redacted] were not documented for the [redacted] Review of complaint and failure analysis records found photos without explanations. These photos were reported to document a variety of nonconformances including "Loss of Hermeticity" and nonconformance sites on the [redacted]. The procedures lack a requirement for disclosing the reason for the photos and any nonconformance exhibited in the photos to support a device failure with evidence of "Loss of Hermeticity". The conclusion given as "The results of the examinations showed that the device was no longer working electrically within specifications," does not include all information that was reasonably known to the manufacturer.

16. Failure to establish and maintain procedures to control product that does not conform to specified requirements. The procedures shall address the identification, documentation, evaluation, segregation, and disposition of nonconforming product. The evaluation of nonconformance shall include a determination of the need for an investigation and notification of the persons or organizations responsible for the nonconformance. The evaluation and any investigation shall be documented, as required by 21 CFR 820.90(a). For example, failure analysis photos show surface contamination of electronic substrates. Even though some contamination was identified as dendrites, other contaminants had not been analyzed. All contaminants could potentially form DC leakage paths. The failure of the cochlear implant can result in pain, uncomfortably loud sound sensation, noise perceptions, etc., but the relationship of these patient perceptions to potential product failure modes is not explained in the failure investigations.

17. Failure to establish and maintain procedures that define the responsibility for review and the authority for the disposition of nonconforming product. The procedures shall set forth the review and disposition process. Disposition of nonconforming product shall be documented. Documentation shall include the justification for use of nonconforming product and the signature of the individual(s) authorizing the use, as required by 21 CFR 820.90(b)(1). For example, review of your firm's quarantined products found that cochlear implants returned from the US and documented as scrapped were, in fact, not scrapped.

18. Failure to maintain device master records (DMR's) and to ensure that each DMR is prepared and approved in accordance with 21 CFR 820.40. The DMR for each type of device shall include, or refer to the location of, the following information: device specifications including appropriate drawings, composition, formulation, componen specifications, and software specifications, as required by 21 CFR 820.181(a). For example, your firm failed to provide specifications for the [redacted] thickness and other [redacted] characteristics for the [redacted] such as bonding strength, peel, crush, leaching, tensile and shear.

19. Failure to establish and maintain procedures for identifying valid statistical techniques required for establishing, controlling, and verifying the acceptability of process capability and product characteristics where appropriate, as required by 21 CFR 820.250(a). For example, there is no information to support the appropriateness of the statistical techniques used, e.g., the number of test samples used to determine acceptability of thick film C40+ [redacted] housing assembly for "equal or better," which is used as a reference for the verification testing of the thin film devices.

In addition, we have included two violations from the Quality System regulation that were listed on the FDA 483 that was issued at the conclusion of the March 29 - April 1, 2004, inspection of MED-EL, as follows:

1. Failure to provide procedures addressing the data entry requirements for transferring information from complaint files to the electronic complaint database. The database is used for data analysis. When all essential information from complaints and failure analysis fails to provide the results of a process, which cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures, as required by 21 CFR 820.75. For example, your firm failed to comply with the requirements of the government standard that is reported by used during validation of the ETO sterilization process. MED-EL stated during the inspection that ETO validation was conducted according to the British Standard EN550:1994 and performance qualification using B3.4.4 Method C: Half-cycle method (EIR - 3/29- 4/1/04-pg.9 & 10). Review of the firm's validation test data indicated that the [redacted] half cycle runs were not performed at the worst case cycle parameter specification of [redacted] ETO gas (the minimum gas concentration specified). The [redacted] validation runs were performed with gas concentrations at [redacted] an [redacted]

Your [redacted] response, [redacted] appears to be adequate.

2. Failure to adequately establish procedures for quality audits and conduct such audits to assure that the quality

system is in compliance with the established quality system requirements and to, determine the effectiveness of the quality system as required b 21 CFR 820.22. For example, a review of [redacted], [redacted] and [redacted] procedure lacked specific procedures for conducting an audit of a contract sterilizer. [redacted] states that to facilitate the auditor's investigations, there may be checklists, recording forms and forms to document nonconformance.

Your firm's [redacted] response appears to be adequate. However, your firm should specify the affected personnc that will be trained on the procedure and checklist. The length of time between the annual audit and the second audit should be specified. Please provide the checklists, recording forms and forms that document nonconformance.

Additionally, the June 7 through June 16, 2004, inspection of MED-EL revealed that your devices are misbrandec within the meaning of section 502(t)(2)of the Act, in that your firm failed or refused to furnish any material of information required by or under section 519 respecting the device and 21 CFR Part 803 - Medical Device Reporting (MDR) regulation. Significant deviations include, but are not limited to the following:

1. Failure to provide documentation and recordkeeping information that facilitates timely follow-up and inspection by FDA, as required by 21 CFR 803.17.(b)(1).

(a) For example, [redacted] does not have sufficient requirements to verify that an MDR forwarded to MED-EL Corporation (North America) for transmission to the FDA was sent to the FDA.

(b) Manufacturer report [redacted] was reportedly filed with FDA. A search of the FDA MDR database showed no record of the filing and MED-EL Corp. (North Americas) could not provide evidence that the report had been transmitted (faxed) to FDA.

3. Failure to provide all MDR information to FDA, as required by 21 CFR 803.50. For exam pie, review of MDR: for cochlear explants resulting from a loss of hermeticity reported the failure mode as electronically no longer working within specifications. The manufacturer was aware that the root cause of these failures was a "Loss of Hermeticity." There were over [redacted] MDR reports attributing device failure to "out of specification" devices without reporting the root cause of the failure as due to a "Loss of Hermeticity." Additionally, your firm was aware that many of the "loss of hermeticity" devices showed evidence of [redacted] and [redacted], on the [redacted], which accounts for some of the pain experienced by device users.

This letter is not intended to be an all-inclusive list of violations at your facility. It is your responsibility to ensure compliance with applicable laws and regulations administered by FDA. The specific violations noted in this letter and in the Inspectional Observations, Form FDA 483 (FDA 483), issued at the closeout of the inspection may be symptomatic of serious underlying problems in your firm's manufacturing and quality assurance systems. You should investigate and determine the causes of the violations, and take prompt actions to correct the violations and to bring your products into compliance.

Given the serious nature of these violations of the Act, cochlear implants (COMB1 40+, C40+ S(compressed), and C40+ (GB)) manufactured by your firm, imported or offered for import are subject to refusal of admission under section 801(a) of the,Act, 21 U.S.C. 381(a), in that . they appear to be adulterated. As a result, FDA may take steps to refuse these products, known as "detained without physical examination," until these violations are corrected.

In order to remove the devices from detention-, you should provide a written response to this Warning Letter as described below and correct the violations described in this letter. We will notify you if your response is adequate and we may need to re-inspect your facility to verify that the appropriate corrections have been made. In addition U.S. federal agencies are advised of the issuance of all Warning Letters about devices so that they may take this information into account when considering the award of government contracts.

A response from you, dated [redacted] concerning our investigators' observations noted on the FDA 483 was sent to us. However, we did not receive your response until [redacted] and are currently reviewing all of the documents, We will continue our review of these documents and communicate our comments to you in a separate letter. In the meantime, however, you should not delay your response to this warning letter.

Please notify this office in writing within fifteen (15) working days from the date you receive this letter, of the specific steps you have taken to correct the noted violations, including an explanation of how you plan to prevent these violations, or similar violations, from occurring again. Include all documentation of the corrective action yo have taken. If you plan to make any corrections in the future, include those plans with your response to this letter as well. If the documentation is not in English, please provide a translation to facilitate our review.

Your response should be sent to the Food and Drug Administration, Center for Devices and Radiological Health, Office of Compliance, Division of Enforcement A, Dental, ENT, and Ophthalmic Devices Branch, 2098 Gaither Road, Rockville, Maryland 20850 USA, to the attention of Ronald L. Swann.

If you need help in understanding the contents of this letter, please contact Betty W. Collins, Director, Division o Enforcement A at (301) 594-4611.

For technical questions, please contact Valerie A. Flournoy at the above address or at (301) 594-4613 or FAX (301) 594-4638.

Sincerely yours,

/s/

Timothy A. Ulatowski
Director
Office of Compliance
Center for Devices and
Radiological Health

---

**Links on this page:**

# ⊞Product Warranty
## & Service Contract Options

  

## 1 MANUFACTURER'S WARRANTY
(Comprised of Cochlear Implant & External Equipment Warranties)

### Cochlear Implant Warranty

The implant is covered by a ten (10) year warranty. MED-EL shall provide a new implant free of charge if the implant fails due to mechanical or electrical defect caused by MED-EL, but does not cover costs associated with implantation. MED-EL will provide assistance, as needed, in obtaining insurance coverage for associated costs. MED-EL provides warranty coverage for the implant under the assumption that recommended surgical techniques are followed; deviation from approved labeling including MED-EL recommended surgical techniques may limit or void warranty.

### External Equipment Warranty
(included with purchase of new implant system)

Provides repair or replacement due to mechanical or electrical defect caused by MED-EL but not due to theft, loss or accidental damage for speech processor, coil, battery packs & FineTuner for 3 years from date of initial stimulation for MED-EL cochlear implant recipients.

A One Time Loss and Damage option is included for patients within the original three years of Manufacturer's Warranty Coverage. Only one claim is allowed per implant System. The maximum allowed claim is one full unit, a unit consisting of one processor, one coil, one battery pack, one FineTuner and one cable. An original police report or notarized letter must be provided to MED-EL before a replacement unit can be shipped. The One Time Loss and Damage option is not available for additional patient kits or speech processor systems purchased separately.

### Terms – Manufacturer's External Equipment Warranty

- Completed Warranty Registration Form must be returned to activate the Manufacturer's Warranty Coverage.
- Warranty void if equipment found to have been:
  1) subjected to physical or electrical abuse, misuse or negligence; 2) repaired or altered other than by MED-EL service personnel; or 3) operated in any manner inconsistent with the applicable MED-EL Instructions for use.
- Owner will be billed for cost of replacement equipment if damage is related to conditions that void warranty coverage or are not due to mechanical or electrical defect caused by MED-EL.
- The Manufacturer's Warranty date for speech processor systems is defined by the initial stimulation date for new purchases; replacements fall within the active warranty dates for the original purchase.
- Lost products automatically become the property of the company upon the date of loss, and warranty coverage ceases as of that date.

---

Sections 2 and 3 are *optional* Service Contracts which may be purchased in addition to or following the Manufacturer's Warranty

## 2 EXTENDED SERVICE CONTRACT

Provides repair or replacement due to mechanical or electrical defect caused by MED-EL but not due to theft, loss or accidental damage for speech processor, coil & battery packs. May be purchased upon expiration of the Manufacturer's Warranty, for a period of 1-3 years, as desired.

| Pricing for OPUS systems | | Pricing for TEMPO+ Systems | |
|---|---|---|---|
| 1 year | $840 | 1 year | $800 |
| 2 years | $1,460 | 2 years | $1,390 |
| 3 years | $1,950 | 3 years | $1,855 |

### Terms – Extended Service Contract

- MED-EL's Extended Service Contract is in no way a substitute for existing coverage under a separate health insurance or home owners policy; please check existing insurance to determine if repair or replacement are covered.
- MED-EL Service Contract will be activated upon receipt of payment for particular coverage chosen. Owner must identify system(s) selected for coverage (by serialized components and implanted side) at the time additional Service Contract coverage is purchased.
- Service Contract void if equipment found to have been:
  1) subjected to physical or electrical abuse, misuse or negligence; 2) repaired or altered other than by MED-EL service personnel; or 3) operated in any manner inconsistent with the applicable MED-EL Instructions for use.
- Owner will be billed for cost of replacement equipment if damage is not due to mechanical or electrical defect caused by MED-EL.
- Continuous coverage is required for the Extended Service Contract in order to honor repairs/replacements needed for your system; any lapse in coverage will require a payment of a reinstatement fee for each year of lapsed coverage. In the event of coverage lapse, a Reinstatement Inspection Form confirming the equipment is in good working condition is required. This inspection MUST be completed by the user's cochlear implant audiologist only.

---



hearLIFE



# MED-EL MANUFACTURERS WARRANTY REGISTRATION FORM
## COMBI 40+ COCHLEAR IMPLANT SYSTEM EXTERNAL EQUIPMENT

**LAST NAME:** _____ **FIRST NAME:** _____ **MIDDLE INITIAL:** _____
**ADDRESS:** _____
**PHONE NUMBER: (H)** _____ **(W)** _____ **DATE OF BIRTH:** _____
**DATE of IMPLANTATION:** _____ **HOSPITAL:** _____
**SURGEON:** _____ **DATE of INITIAL STIMULATION:** _____
**CLINIC:** _____ **AUDIOLOGIST:** _____

### 1ST SPEECH PROCESSOR

*If you have a TEMPO+ System (Behind the Ear):*
Speech Processor Serial # _____
Coil Serial # _____
Remote Battery Pack Serial # _____

*If you have a CISPRO+ System (Body-worn):*
Speech Processor Serial # _____
Coil Serial # _____
Microphone Serial # _____

### 2ND SPEECH PROCESSOR

*If you have a TEMPO+ System (Behind the Ear):*
Speech Processor Serial # _____
Coil Serial # _____

*If you have a CISPRO+ System (Body-worn):*
Speech Processor Serial # _____
Coil Serial # _____
Microphone Serial # _____

Manufacturers warranty coverage period is established by date of initial stimulation. Replacements will be with like models. Replacement equipment is covered under the warranty period for the original purchased system. Any equipment covered under warranty *must be returned to MED-EL within 30 days* of shipment of replacement equipment in order for the customer to avoid being billed for the replacement.

Manufacturers warranty includes ONE free-of-charge replacement for a stolen, lost or damaged unit. Please see the attached brochure for details about Theft, Loss & Accidental Damage coverage, which may be purchased from MED-EL Corporation or limited Theft, Loss & Accidental Damage coverage, which may be purchased from ESCO. Extended Manufacturers Warranty coverage may also be purchased once the original Manufacturers Warranty has expired. Extended Warranty options are not available to Florida residents due to state law restriction. Medicare Part B, and Medicaid beneficiaries, are not eligible to purchase Extended Warranty options since benefits are provided under these health insurance programs for equipment replacement or repair. Since other health insurers may also provide coverage for repairs and replacements, MED-EL recommends you review your insurance coverage prior to purchasing an Extended Warranty.

**SIGNATURE/OWNER:** _____ **DATE:** _____

### TO ACTIVATE YOUR MANUFACTURERS WARRANTY FOR YOUR MED-EL COCHLEAR IMPLANT EXTERNAL COMPONENTS, THIS FORM MUST BE COMPLETED AND RETURNED TO:

**MED-EL CORPORATION**
2222 EAST HWY 54 SUITE B-180
DURHAM, NC 27713

Q9037 Rev. 1.2



# CLIENT BILL OF RIGHTS AND RESPONSIBILITIES

MED-EL clients have a right to be notified in writing of their rights and obligations.  The client's family, with the client's permission, or guardian may exercise the client's rights when the client has been judged incompetent or is a minor.  MED-EL has an obligation to protect and promote the rights of its client's to care, treat and provide services within MED-EL's capability and mission, and in compliance with applicable laws, regulations and standards including the following rights.

## YOU HAVE THE RIGHT TO:

- Be treated, and have your property treated, with dignity, courtesy and respect, recognizing that each person is a unique individual.

- Have relationships with MED-EL that are based on honesty and ethical standards of conduct.

- Be fully informed of MED-EL's policies and procedures for receiving, reviewing and resolving your complaints or concerns about your device.

- Receive complete explanations of charges for equipment, including eligibility for third-party reimbursement, and charges for which you may be responsible.

- Receive quality services and equipment that meet or exceed professional and industry standards regardless of race, religion, political belief, sex, social or economic status, age, or disability.

- Receive instructions on safe and effective operation of equipment and your responsibilities regarding care of the equipment.

- Confidentiality of all your records.

- Review information about to whom and when your personal health information was disclosed, as permitted under applicable law and as specified in MED-EL's policies and procedures.

- Express dissatisfaction and to suggest changes without discrimination, reprisal or unreasonable interruption of services.

- Be advised of the telephone number and hours of operation of MED-EL.

- Receive information in a manner and/or language that you understand.

- Have family members, as appropriate and allowed by law, with your permission or permission of your surrogate decision maker, involved in service decisions.

## CLIENT BILL OF RIGHTS AND RESPONSIBILITES (continued)

### CLIENT RESPONSIBILITIES:

- You have the responsibility to:

    - Adhere to MED-EL's policies and procedures.
    - Provide, to the best of your knowledge, accurate and complete medical and personal information necessary for MED-EL to provide services.
    - Ask questions about your services, or to have clarified any instructions provided by MED-EL's representatives.
    - Communicate any information, concerns and/or questions related to your device.
    - Treat MED-EL personnel with respect and dignity without discrimination.
    - Care for and safely use equipment, according to instructions provided, for the purpose it was intended and for the client for whom it was provided.
    - Except where contrary to federal or state law, you are responsible for charges which your insurance does not pay. You are responsible for prompt settlement in full of your account unless prior arrangements have been approved by MED-EL's administration.
    - Notify MED-EL immediately of any address or telephone changes whether temporary or permanent.

### CLIENT INFORMATION:

- After-Hours Services:
    - An on call service is available for after hour's calls. Please call 1-888-633-3524.

- Complaint Procedure:

    - You have the right and responsibility to express concerns, dissatisfaction or make complaints about products and/or services you do or do not receive without fear or reprisal, discrimination or unreasonable interruption of services. MED-EL's phone number is 1-888-633-3524. When you call, ask to speak with the customer service representative servicing your area.
    - For product related grievances, MED-EL has a grievance procedure that ensures that your concerns shall be reviewed and an investigation started within 48 hours. Every attempt shall be made to resolve all product related grievances within 14 days.